UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JASON THORNTON,

                    Plaintiff,               Case No. 11-cv-15527
                                                  Honorable Nancy G. Edmunds
          v.                           Magistrate Judge David R. Grand

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.

_____/

**REPORT AND RECOMMENDATION**
**ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 9]**

      Plaintiff Jason Thornton ("Thornton") brings this action pursuant to 42 U.S.C. §405(g),

challenging the final decision of Defendant Commissioner of Social Security ("Commissioner")

denying his application for Supplemental Security Income ("SSI") under the Social Security Act

(the "Act").  Both parties have filed summary judgment motions [8, 9], which have been referred

to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.**       **RECOMMENDATION**

      For the reasons set forth below, the court finds that the Administrative Law Judge

("ALJ") erred in failing to consider Thornton's physical impairments in light of the requirements

of Listing 14.09D ("inflammatory arthritis").  As such, the ALJ's conclusion that Thornton is not

disabled under the Act is not supported by substantial evidence.  Accordingly, the court

recommends that the Commissioner's Motion for Summary Judgment [9] be DENIED,

Thornton's Motion for Summary Judgment [8] be GRANTED IN PART to the extent it seeks

remand and DENIED IN PART to the extent it seeks an award of benefits, and that, pursuant to

sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further

proceedings consistent with this Recommendation.

## II.   REPORT

### A.   Procedural History

On October 15, 2008, Thornton filed an application for SSI, alleging disability beginning on June 2, 2007.  (Tr. 160-66).  His claim for SSI was denied initially on November 10, 2008. (Tr. 86).  Thornton filed a timely request for an administrative hearing, which was held on August 6, 2010 before ALJ Peter Dowd.[1]  (Tr. 28-73).  Thornton, who was represented by attorney Robert MacDonald, testified at the hearing, as did vocational expert ("VE") Timothy Shaner.  (Tr. 33-73).  On September 9, 2010, the ALJ found that Thornton was not disabled.  (Tr. 14-23).  On November 16, 2011, the Appeals Council denied review. (Tr. 1-3).  Thornton filed for judicial review of the final decision on December 17, 2011 [1].

### B.   Background

#### 1.   Disability Reports

In an October 16, 2008 disability field office report, Thornton reported that his alleged onset date was June 2, 2007.  (Tr. 188). During a face-to-face interview, the claims examiner noted that Thornton had difficulty standing and walking (he walked with a limp).  (Tr. 189).

In an undated disability report, Thornton indicated that his ability to work is limited by a "bone spur."  (Tr. 192).  He explained that, in the morning, he is unable to stand until his medication "kicks in."  (*Id.*).  Thornton reported that this condition first interfered with his ability to work on June 2, 2007, and that he became unable to work on that date.  (*Id.*).  Prior to that, Thornton had not worked since February 21, 2006, when he was working as a cook until his

---

[1] Prior to that, Thornton's administrative hearing had been scheduled for April 6, 2010. Thornton appeared at that hearing by himself and requested a postponement so that he could obtain legal representation.  (Tr. 75-85).  The ALJ granted this request.  (*Id.*).

restaurant employer "closed down." (Tr. 192-93). In that job, Thornton had been required to walk, stand, reach, and handle big and small objects eight hours per day. (Tr. 193). He was frequently required to lift fifty pounds. (Tr. 194). In addition to working as a cook, Thornton previously had been employed as a caregiver, labeling/boxer/chemical mixer, laborer, stock person, and tire changer. (Tr. 193). Thornton has an eleventh grade education and completed a sales training course in 2006. (Tr. 197). He indicated that he had treated with two different medical providers regarding his bone spur. (Tr. 194-95). At the time of the report, he was taking only ibuprofen, and it caused no side effects. (Tr. 196).

In a function report dated October 28, 2008, Thornton reported that he lives in a house with his family. (Tr. 203). When he wakes up, he is in pain for about four hours, so he takes medication to ease that pain. (*Id.*). He then washes up, gets dressed, and tries to clean up or cook for his family. (*Id.*). At bedtime, the pain returns, so he takes more pain medication. (*Id.*). He claims that the pain affects his sleep and is so severe that he cries "all through the night." (Tr. 204). He is able to care for his children. (*Id.*). He has a hard time putting on shoes and socks, as well as stepping into the bathtub. (*Id.*). Thornton cooks less than he used to because it is hard for him to stand up, but he prepares meals weekly. (Tr. 205). He cleans the house, although at a slow pace. (*Id.*). He is able to go outside alone and drive a car, but he does not do any shopping. (Tr. 206). His hobbies include watching television and racing radio-controlled cars. (Tr. 207). He regularly spends time with others, goes to church, and attends sporting events. (*Id.*).

When asked to identify functions impacted by his conditions, Thornton checked lifting (depending on the weight), squatting, standing, walking, kneeling, and stair climbing. (Tr. 208). These activities put pressure on his foot, which causes it to "swell up severely" and results in

3

"extreme pain." (*Id.*). His ability to walk without interruption depends on the pain he is experiencing, and if he is in severe pain, he cannot pay attention. (*Id.*). However, he is able to follow written and spoken instructions well and does not have trouble getting along with authority figures. (Tr. 208-09). He uses crutches, which were prescribed after a surgery in June of 2007. (Tr. 209).

In a disability appeals report dated February 8, 2009, Thornton reported that his condition had worsened since the time of his last report, and the pain was "very severe." (Tr. 221). He had seen one doctor for high blood pressure and gouty arthritis, and a different doctor for "osteoarthropy in left talonavicular joint," both in January of 2009. (Tr. 222-23). In addition, he had visited the emergency room at Hurley Hospital on February 6, 2009. (Tr. 223). As of the date of the report, he was taking amlodipine besylate, quinapril, and hydrochlorothiazide (for high blood pressure); ranitidine (for acid reflux); indomethacin (for arthritis); and ibuprofen and oxaprozin (for pain). (Tr. 224). He reported no changes in his daily activities since the time of his last report. (Tr. 226).

### 2.    *Plaintiff's Testimony*

At the August 6, 2010 hearing before the ALJ, Thornton testified that he was six feet tall and weighed two hundred eighty nine pounds, which was down from a recent high of three hundred forty. (Tr. 40). He has been overweight for "a while," and has a history of hypertension. (Tr. 41). At the time of the hearing, Thornton was thirty-four years old. (Tr. 35). He does not have a high school degree or its equivalent. (*Id.*).

Thornton testified to two relevant conditions. First, Thornton said that he has a history of gouty arthritis in his left wrist, which is spreading toward his left elbow. (Tr. 41-42, 44). Upon further questioning, he indicated that he has been diagnosed with rheumatoid arthritis, but only in

his left wrist.[2]  (Tr. 43).  As a result of this condition, his left wrist swells and is very painful, requiring him to wear a brace.  (Tr. 52-54).  Second, Thornton testified that he has pain in his left foot, which originally was caused by a bone spur but has now developed into osteoarthritis, and causes him "unbearable" pain.  (Tr. 42, 50, 52).  He can only stand on his left foot for fifteen to twenty minutes before it becomes uncomfortable.  (Tr. 50).  He can, however, walk a couple of blocks to the store.  (Tr. 51).  Thornton elevates his foot, mostly at nighttime and in the morning, in order to alleviate the pain and swelling.  (Tr. 51).  He testified that he recently started experiencing pain in his right foot and, at his last doctor's visit, received cortisone shots in both feet.  (Tr. 45).

Thornton testified that the pain caused by his conditions wakes him up at night; as a result, he often stays in bed until 11:00 a.m.  (Tr. 54-55).  When he does get up, he wears a housecoat or loose clothes, and he no longer wears sneakers.  (Tr. 55).  He can sort clothing, but does not take clothing to the basement or do dishes, and he has not done yard work since 2008.  (Tr. 56-57).  Thornton takes Tylenol 4, which causes him to feel "wooziness."[3]  (Tr. 61).  As a result, he takes naps on the couch and typically sleeps as much as six hours throughout the day.  (Tr. 62-63).  He spends some time sitting outside in a lawn chair, and he watches two to three hours of television per day.  (Tr. 57).  He also leaves the house to visit friends for a couple hours per day, and can drive to visit these friends.  (Tr. 58-59).

Thornton testified regarding his previous employment.  In 2006, he received job training to work as an auto salesman, but he only held that job for two weeks.  (Tr. 35).  Between 1996 and 2006, Thornton worked as a cook for a number of restaurants, and also held positions as a

---

[2] Thornton is right-handed.  (Tr. 41).

[3] In addition to Tylenol 4, at the time of the hearing, Thornton reported taking folic acid, Plaquenil, Humira, hydrochlorothiazide, quinapril, and prednisone.  (Tr. 45-47).

care provider, packager, stock person, and tire changer.  (Tr. 37-39).  He last held a job in 2006 as a cook, and left that position because the restaurant closed.  (Tr. 40, 50).  Thornton does not believe he can do any of the jobs he performed in the past because he cannot use both hands, and he does not think he could work in a more sedentary job because his medications cause him to fall asleep during the day.  (Tr. 60-61).  Presently, he does not attempt to lift, push or pull with his left hand.  (Tr. 59).  He can, however, use that hand to handle money.  (Tr. 59-60).

> 3.    *Medical Evidence*

The record contains treatment records from Associated Foot Clinic, Hamilton Clinic, and Michigan Rheumatology Group.  Each set of records will be discussed in turn.

> (a)    *Associated Foot Clinic – Dr. Timothy Snyder*

Thornton treated with Dr. Timothy Snyder at Associated Foot Clinic from May 2007 to May 2010.  In May 2007, he had surgery performed on his left foot to remove a bone spur.  (Tr. 297-99).  Over the next few weeks, Thornton had a series of normal post-operative visits.  (Tr. 293-96).  Thereafter, he made many visits to the office complaining of pain in his left foot, usually once or twice per month, the details of which are summarized below.

On June 27, 2007, Thornton's left foot was "sore," and he received an injection for pain.  (Tr. 292).  One month later, he visited the office, complaining of pain and swelling in the same foot and again received an injection.  (Tr. 291).  In August 2007, Thornton visited the office and reported "mild soreness" in his foot.  (Tr. 290).  Three months later, in November 2007, Thornton again visited the office with pain in his left foot; the treating physician ordered x-rays, which ruled out a fracture.  (Tr. 289, 313-14).  In December 2007, Thornton again complained of

pain in his left foot,[4] for which the treating physician recommended anti-inflammatory medication and orthotics. (Tr. 288).

At a February 2008 office visit, the treating physician noted that Thornton was having trouble with his toe nails but that his ankle was "doing much better" and that he "doesn't seem to have any of the acute tenderness in either foot." (Tr. 253). The next month, however, Thornton returned with pain in his left foot, for which he was prescribed Motrin. (Tr. 254). In October 2008, Thornton visited the office with "significant pain and discomfort" in his left foot, but he chose to "refrain from injection." (Tr. 347). Thornton visited the office with soreness in November 2008, but again declined injection therapy. (Tr. 348). The doctor recommended ice, stretching, arch supports, and anti-inflammatory medication at this visit, and continued to make similar recommendations throughout December 2008.[5] (Tr. 348-50). Thornton did receive an injection in late December 2008 (Tr. 351), but he visited the office again in January 2009 and declined an injection then, saying that his left ankle was "much improved." (Tr. 352). In February 2009, Thornton again refused an injection because he felt he was "doing quite well." (Tr. 282, 353). Beginning in March 2009 and continuing until March 2010, Thornton continued to visit the office on a semi-regular basis, sometimes receiving injections for the pain in his left foot, but other times declining to do so. (Tr. 355, 360, 363, 366, 367).

On May 24, 2010, Dr. Snyder completed a Medical Source Statement. (Tr. 371-72). He noted that Thornton had been diagnosed with osteoarthritis in the left mid-foot and capsulitis in the tarsal/metatarsal joint of his left foot. (Tr. 371). Dr. Snyder opined that, during the course of

---

[4] Although the typewritten notes pertaining to this visit refer to Thornton's right foot, the handwritten notes indicate that he complained of a painful left foot. (Tr. 288). Moreover, it was noted that Thornton had "previous ankle surgery," which may have caused some of the pain he was experiencing, which further suggests that the pain was in the left foot. (*Id.*).

[5] Indeed, physicians at Associated Foot Clinic recommended fairly conservative treatment including orthotics, arch supports, stretching, rest, ice, and elevation. (Tr. 288, 361, 362, 365).

an eight-hour workday, Thornton could sit for eight hours (without interruption), stand for four hours (up to two hours at a time), and walk for two hours (up to one hour at a time).  (*Id.*).  Dr. Snyder also noted that Thornton would have to be able to sit or stand at his own discretion, but did not need to lie down or recline.  (*Id.*).  Dr. Snyder indicated that Thornton could occasionally bend and stoop and could frequently kneel, but was extremely limited in squatting.  (*Id.*).  According to Dr. Snyder, Thornton could use repetitive foot controls, though he would need to occasionally elevate his legs.[6]  (*Id.*).  Despite these conclusions, however, Dr. Snyder also opined that Thornton's pain, fatigue, or other symptoms would markedly interfere with his ability to complete a normal workday or workweek without interruption, or to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 372).

*(b)      Hamilton Clinic – Dr. Robinson*

Thornton also saw Dr. Robinson, his primary care physician, at Hamilton Clinic from February 2008 to May 2010.  Dr. Robinson noted that Thornton was reporting pain in his left foot and left wrist.  (Tr. 264, 268).  In April 2008, Dr. Robinson ordered x-rays of Thornton's left wrist, which showed no osseous, joint or soft tissue abnormality, as well as normal bone density.  (Tr. 268, 276-78).  By May 2009, however, Dr. Robinson had referred Thornton to Dr. Ali Karrar at Michigan Rheumatology Group for further evaluation of his left wrist.  (Tr. 426).

On July 24, 2009, Dr. Robinson noted that Thornton was seeking disability benefits and stated that Thornton's "condition does not appear to be disabling."  (Tr. 392-93).  At a visit on August 24, 2009, Thornton again sought paperwork from Dr. Robinson declaring him disabled.  (Tr. 390).  As the ALJ noted, Dr. Robinson unequivocally stated that he did not believe Thornton

---

[6] Dr. Snyder did not evaluate Thornton's upper-body capabilities, marking "N/A" for those portions of the statement.  (Tr. 371-72).

was totally and permanently disabled, saying "Patient's condition, although temporarily caused some disability, is <u>not</u> a permanent situation." (Tr. 391) (emphasis in original). In November 2009, Dr. Robinson again noted that Thornton was "<u>not</u> disabled," although he did have some physical limitations. (Tr. 387) (emphasis in original). In December 2009, Dr. Robinson switched Thornton to long-term anti-inflammatories for gouty arthritis. (Tr. 383). Thornton continued to complain of left wrist pain at subsequent visits in 2010. (Tr. 380, 378, 376). It is worth noting, however, that at many of his visits to Dr. Robinson between 2008 and 2010, Thornton indicated that his pain was a 0 on a scale of 0 to 10. (*See, e.g.,* Tr. 380, 382, 384, 386, 390, 392, 394, 396, 400, 404, 416).

Dr. Robinson completed a Medical Source Statement on June 15, 2010. (Tr. 451-52). He indicated that Thornton had been diagnosed with osteoarthrosis, rheumatoid arthritis, and gouty arthritis. (Tr. 451). Dr. Robinson opined that, during the course of an eight-hour workday, Thornton could sit for seven hours (up to two hours at a time), stand for four hours (up to thirty minutes at a time), and walk for two hours (up to thirty minutes at a time). (*Id.*). Dr. Robinson also noted that Thornton would have to be able to sit or stand at his own discretion, but did not need to lie down or recline. (*Id.*). Dr. Robinson indicated that Thornton could frequently bend and could occasionally squat, kneel, and stoop. (*Id.*). According to Dr. Robinson, Thornton could use repetitive foot controls, and he would not need to elevate his legs. (*Id.*).

With respect to Thornton's upper extremities, Dr. Robinson opined that he could frequently engage in simple grasping and reaching, and could occasionally engage in pushing and pulling, fine manipulating, and reaching above shoulder level. (*Id.*). According to Dr. Robinson, during the course of an eight-hour workday, Thornton could frequently lift up to five pounds, and could occasionally lift up to twenty pounds. (Tr. 452). Thornton was to avoid all

repetitive and forceful use of the upper extremities, however. (*Id.*). Dr. Robinson further opined that Thornton's pain, fatigue, or other symptoms would not markedly interfere with his ability to "understand, remember and/or carry out instructions," but would markedly interfere with his ability to "maintain attention and concentration for extended periods of time," and to "work, on a sustained and continuous basis, a normal workday or workweek without interruption, or to perform at a consistent pace without an unreasonable number and length of rest periods." (*Id.*). Despite those findings, however, Dr. Robinson did not indicate that Thornton's pain, fatigue or other symptoms would "likely result in [him] being off task or away from a work station in a typical workday more than two 15 minute breaks and a 30 minute lunch," nor cause him to miss three or more days of work in a typical month. (*Id.*).[7]

(c)   <em>Michigan Rheumatology Group – Dr. Ali Karrar</em>

In May 2009, Dr. Robinson referred Thornton to Dr. Ali Karrar at Michigan Rheumatology Group for evaluation of joint pain and tenderness in the left wrist.[8] (Tr. 426). Dr. Karrar noted Thornton's complaints of pain in his wrist, along with evidence of pain, swelling and tenderness upon movement. (*Id.*). He was diagnosed with osteoarthrosis, rheumatoid arthritis, and gout, was started on Depomedrol and prednisone, and laboratory tests were ordered. (Tr. 426-27). On July 30, 2009, Thornton returned to the office, where Dr. Karrar noted the same symptoms, including "constant" pain of 10/10, as well as diffuse synovitis in the left ankle. (Tr. 427-28). His notes also indicate that Thornton's test results showed "positive RF and

---

[7] Dr. Robinson did, however, indicate that whether Thornton experienced such limitations would "depend on the specifics of the job." (Tr. 452).

[8] Dr. Karrar's treatment notes alternately refer to pain in both the right and left wrist. (Tr. 426). At the hearing before the ALJ, however, Thornton testified unequivocally that his arthritis is located only in his left wrist. (Tr. 43). Consequently, any references to Thornton's right wrist appear to be typographical errors.

10

ACCP," confirming that he was seropositive for rheumatoid arthritis. (Tr. 428). Thornton was prescribed another course of prednisone and was started on methotrexate. (Tr. 429).

At an office visit on September 8, 2009, Thornton reported that the severity of his condition was "a 10 on a scale of 1-10 with 10 being the worst. Pain is constant." (Tr. 323). In November 2009, however, Thornton twice visited Dr. Karrar's office, complaining of pain that was "moderate" and "mostly located" in his left wrist. (Tr. 430-32). X-rays from December 2009 showed a "progression of loss of joint space," compared to prior x-rays taken in May 2009. (Tr. 449). Thornton continued to treat with Dr. Karrar for his rheumatoid arthritis through the time of the hearing, during which time Dr. Karrar frequently changed Thornton's medications and dosages in an apparently unsuccessful effort to relieve his pain. (Tr. 435-41).

On August 5, 2010, Dr. Karrar completed a Medical Source Statement, indicating that Thornton had been diagnosed with osteoarthritis, rheumatoid arthritis, and gout. (Tr. 453-54). According to Dr. Karrar, during the course of an eight-hour workday, Thornton could sit for two or three hours (without interruption), stand for one hour (up to fifteen minutes at a time), and walk for thirty minutes (fifteen to thirty minutes at a time). (Tr. 453). Dr. Karrar also noted that Thornton would have to be able to sit or stand at his own discretion, but did not need to lie down or recline. (*Id.*). Dr. Karrar indicated that Thornton could frequently bend, but could never squat, kneel, or stoop. (*Id.*).

With respect to Thornton's upper extremities, Dr. Karrar opined that he could occasionally engage in reaching, but was extremely limited in simple grasping, pushing and pulling, and fine manipulating. (*Id.*). According to Dr. Karrar, during the course of an eight-hour workday, Thornton could not lift with his left hand. (Tr. 454). Thornton was to avoid all repetitive and forceful use of the upper extremities. (*Id.*). Dr. Karrar opined, however, that

11

Thornton's pain, fatigue, or other symptoms would not markedly interfere with his ability to "understand, remember and/or carry out instructions," to "maintain attention and concentration for extended periods of time," or to complete a normal workday or workweek without interruption, or perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.*).

### 4.    *Vocational Expert's Testimony*

Timothy Shaner testified as an independent vocational expert ("VE"). (Tr. 64-71). The VE characterized Thornton's past relevant work as a cook and care provider as semi-skilled in nature and medium exertion; his work as a packager as unskilled and medium exertion; and his work as a tire changer as semi-skilled, heavy exertion. (Tr. 65). The ALJ asked the VE to imagine a claimant of Thornton's age, education, and work experience, who was able to perform sedentary work, with the following additional restrictions:  (a) he can lift/carry up to twenty pounds with the right (dominant) hand and arm, but only two pounds or less with the left (non-dominant) hand and arm; (b) he can stand/walk intermittently for up to two hours in an eight hour day and can sit for six hours in an eight hour day; (c) he is limited to occasional climbing of stairs, balancing and stooping, and should not be required to engage in significant kneeling, crouching or crawling; (d) he is limited to only occasional handling, fingering and feeling with the left hand; and (e) he should avoid exposure to machinery, vibrations, and hazards such as unprotected heights or moving industrial machinery.  (Tr. 65-66).  The VE testified that the hypothetical individual would not be capable of performing Thornton's past relevant work.  (Tr. 66).  However, the VE testified that the hypothetical individual would be capable of working in the positions of surveillance system monitor (400 jobs in the lower peninsula of Michigan), information clerk (2,500 jobs), and inspector (600 jobs).  (Tr. 67).  Upon further questioning by

Thornton's attorney, the VE testified that if the hypothetical individual needed to elevate his leg more than six to eight inches, or if he needed to take naps during the day, he would not be able to sustain competitive employment.  (Tr. 70).

### C.    Framework for Disability Determinations

Under the Act, SSI is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the

analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]." *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.      The ALJ's Findings

Utilizing the five-step sequential analysis, the ALJ found that Thornton has not been disabled under the Act since October 15, 2008, the application date.  At Step One, the ALJ found that Thornton has not engaged in substantial gainful activity since October 15, 2008.  (Tr. 16). At Step Two, the ALJ found that Thornton has the following severe impairments: rheumatoid arthritis affecting the left wrist, degenerative arthritis of the left ankle/foot, and obesity with a history of gout.  (Tr. 16-17).   At Step Three, the ALJ found that Thornton's impairments, whether considered alone or in combination, do not meet or medically equal Listing 1.02 (major dysfunction of a joint) or "any other relevant listing."  (Tr. 17-18).

The ALJ then then assessed Thornton's residual functional capacity ("RFC"), concluding that he is capable of performing sedentary work, but with numerous other physical limitations. (Tr. 18-21).  At Step Four, the ALJ found that, given Thornton's RFC, he is unable to perform his past relevant work as a cook, tire changer, or packager.  (Tr. 21).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Thornton is capable of performing a significant number of jobs that exist in the regional economy.  (Tr. 21-22).  As a result, the ALJ concluded that Thornton is not disabled under the Act.  (Tr. 22).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted). In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case de novo, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings for substantial evidence, the court is limited to an examination of the record and must consider the record as a whole. *See Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ. *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted

by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

    **F.**    **Analysis**

        *1.*    *The ALJ's Failure to Evaluate Thornton's Impairments In Light Of Listing 14.09D Constitutes Legal Error*

In his Step Three analysis, the ALJ concluded that neither Thornton's ankle nor his wrist impairment meets the requirements of "listing section 1.02 [major dysfunction of a joint] or any other relevant listing section."  (Tr. 17).  However, his analysis expressly considered only the elements of Listing 1.02 which required Thornton to show either "A. Involvement of one major peripheral weight-bearing joint (i.e., [] ankle), resulting in inability to ambulate effectively [] OR B. Involvement of one major peripheral joint in each upper extremity…"  20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 1.02.  Specifically, the ALJ found that Thornton "appears capable of 'effective ambulation,'" (addressing subpart A) and his "right, dominant upper extremity is apparently unaffected thus far by his arthralgias" (addressing subpart B).  (Tr. 17-18).  Thornton argues that the ALJ erred in failing to specifically consider whether his impairments meet Listing 14.09D for inflammatory arthritis.  (Doc. #8 at 15-18).  As discussed below, the court finds merit to this argument.

Under the theory of presumptive disability, a claimant is eligible for benefits if he has an impairment that meets or medically equals a Listed Impairment.  *See Christephore v. Comm'r of Soc. Sec.*, 2012 WL 2274328, at *6 (E.D. Mich. June 18, 2012).  When considering presumptive disability at Step Three, "an ALJ must analyze the claimant's impairments in relation to the Listed Impairments and must give a reasoned explanation of his findings and conclusions in

16

order to facilitate meaningful review." *Id.* (citing *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x

411, 416 (6th Cir. 2011)).   Failure to provide sufficient articulation of Step Three findings is

error.   *See M.G. v. Commissioner of Soc. Sec.*, 861 F. Supp. 2d 846, 858-59 (E.D. Mich. 2012);

*Reynolds*, 424 F. App'x at 416; *Tapp v. Astrue*, 2011 WL 4565790, at *5 (E.D. Ky. Sept. 29,

2011) (discussing reversal in a series of cases where the ALJ "made only a blanket statement that

the claimant did not meet or equal a Listing section").   This is because under the Social Security

Act:

> The Commissioner of Social Security is directed to make findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter.  Any such decision by the Commissioner of Social Security which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.

42 U.S.C. §405(b)(1).

As explained in the oft-cited Tenth Circuit opinion in *Clifton v. Chater*, 79 F.3d 1007,

1009 (10th Cir. 1996):

> This statutory requirement fits hand in glove with our standard of review. By congressional design, as well as by administrative due process standards, this court should not properly engage in the task of weighing evidence in cases before the Social Security Administration. Rather, we review the Secretary's decision only to determine whether [his] factual findings are supported by substantial evidence and whether [he] applied the correct legal standards.

Thus, in numerous cases similar to this one, courts have recognized that the failure of an

ALJ to explicitly consider whether a claimant's impairments meet or medically equal a Listed

Impairment constitutes legal error.   For example, in *Bolla v. Commissioner of Soc. Sec.*, 2012

WL 884820, at *6-8 (E.D. Mich. Feb. 3, 2012), the ALJ concluded at Step Two that the plaintiff

had the severe impairments of multiple sclerosis and depression, but then simply stated, in

17

conclusory fashion, that "the impairments, or combination of impairments, do not meet or medically equal the specific criteria of 1.00 Musculoskeletal Symptoms, 11.00 Neurological, 12.00 Mental Disorders." *Id.* at *6.  The ALJ specifically considered the plaintiff's depression in light of Listing 12.04 (affective disorders), but did not consider any other listing – including Listing 11.09 (multiple sclerosis) – in any detail whatsoever.  *Id.*  In concluding that the ALJ had erred in performing his Step Three analysis, the *Bolla* court held that the "ALJ's lack of narrative deprives the federal court of its ability to act as an appellate tribunal and instead forces the court to become the finder of fact . . . ."  *Id.*  Consequently, the *Bolla* court determined that remand was appropriate.

Similarly, in *Christephore*, *supra*, the court held that the ALJ erred in failing "to evaluate (or even mention) the relevant listing" when determining medical equivalence at Step Three.  *Christephore*, 2012 WL 2274328, at *5.  In that case, the ALJ concluded that the plaintiff had the severe impairment of HIV, but then failed to consider whether the plaintiff met or medically equaled Listing 14.08 (HIV infection), saying only that the plaintiff's impairments did not meet or medically equal Listing 14.00 (Immune System Disorders).  *Id.* at *5-6.  In concluding that the ALJ erred, the court explained:

> The ALJ does not evaluate Plaintiff's physical symptoms in relation to those described in 14.00 and does not articulate his reasons for finding that Plaintiff's symptoms do not meet or equal those criteria.  His conclusory, one-sentence statement that Plaintiff's impairments do not meet or medically equal the criteria of 14.00 is contrary to the requirements that ALJs explain the reasons for their decisions.

*Id.* at *6.  A similar conclusion was reached in *M.G.*, 861 F. Supp. 2d at 858, where "the ALJ did not cite, discuss, or resolve any conflicts in the evidence in concluding that [the claimant] did not meet or medically equal a Listing.  Nor did the ALJ even identify which Listing(s) [claimant's] impairments were compared with."  (citing *Miller v. Comm'r*, 181 F. Supp. 2d 816, 820 (S.D.

Ohio 2001) ("whether or not plaintiff came forward with the requisite evidence at Step 3, the ALJ was required to discuss that evidence, relative to the Listings…").  *See also Christephore*, 2012 WL 2274328, at *7 ("It was not Christephore's job to point the relevant listings out to the ALJ; it was the ALJ's job to identify and address them." (citing *Burnett v. Comm'r*, 220 F.3d 112, 120 n. 2 (3d Cir. 2000) ("Putting the responsibility on the ALJ to identify the relevant listed impairment(s) is consistent with the nature of social security disability proceedings which are inquisitorial rather than adversarial and in which it is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits.")).

       In this case, Thornton argues that the ALJ erred in failing to consider whether his impairments meet or medically equal Listing 14.09 for "inflammatory arthritis."  (Doc. #8 at 15-18).  That Listing refers to a condition that generally is described as follows:

> The spectrum of inflammatory arthritis includes a vast array of disorders
> that differ in cause, course, and outcome.  Clinically, inflammation of
> major peripheral joints may be the dominant manifestation causing
> difficulties with ambulation or fine and gross movements; there may be
> joint pain, swelling, and tenderness.  The arthritis may affect other joints,
> or cause less limitation in ambulation or the performance of fine and gross
> movements.  However, in combination with extra-articular features,
> including constitutional symptoms or signs (severe fatigue, fever, malaise,
> involuntary weight loss), inflammatory arthritis may result in an extreme
> limitation.

Listing 14.00D6.  The ALJ explicitly found that Thornton suffers from the severe impairment of "rheumatoid arthritis affecting the left wrist."  (Tr. 16).  Listing 14.00D6 makes clear that inflammatory arthritis (as defined in Listing 14.09D) "may be associated with" rheumatoid arthritis.  Because the ALJ concluded that Thornton suffers from rheumatoid arthritis, and because inflammatory arthritis may be associated with this condition, the ALJ should have addressed Thornton's impairment(s) in light of Listing 14.09D.  His failure to do so constitutes legal error.  *See e.g.*, *M.G.*, 861 F. Supp. 2d at 858-59; *Bolla*, 2012 WL 884820, at *6-8.

2.      *The ALJ's Error Was Not Harmless*

This court will not, however, overturn an ALJ's decision if the failure to articulate Step

Three findings was harmless.  *See M.G*, 861 F. Supp. 2d at 859.  Such an error is harmless where

"concrete factual and medical evidence is apparent in the record and shows that even if the ALJ

had made the required findings, the ALJ *would have* found the claimant not disabled…."  *Id.* at

861 (quoting *Juarez v. Astrue*, 2010 WL 743739, at *5-6 (E.D. Tenn. Mar. 1, 2010)) (internal

quotations omitted) (emphasis in original).  In cases where the evidence is such that a possibility

exists that a listing is met, remand is appropriate.  *See Reynolds*, 424 F. App'x at 416 ("in this

case, correction of such an error is not merely a formalistic matter of procedure, for it is possible

that the evidence [the plaintiff] put forth could meet this listing"); *see also May v. Astrue*, 2011

WL 3490186, at *9 (N.D. Ohio June 1, 2011).

In order for Thornton to meet the criteria of Listing 14.09D, he must show:

> Repeated manifestations of inflammatory arthritis, with at least two of the
> constitutional symptoms or signs (severe fatigue, fever, malaise, or
> involuntary weight loss) and one of the following at the marked[9] level:
>
> 1.  Limitation of activities of daily living.
>
> 2.  Limitation in maintaining social functioning.
>
> 3.  Limitation in completing tasks in a timely manner due to deficiencies
>     in concentration, persistence, or pace.

20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 14.09D.

As an initial matter, the record contains evidence suggesting that Thornton has

experienced "repeated manifestations" of inflammatory arthritis.[10]  For example, Thornton

---

[9] "Marked" is defined as "more than moderate but less than extreme."  Listing 14.00I5.

[10] According to the Listings, "repeated" means: ". . . that the manifestations occur on an average
of three times a year, or once every 4 months, each lasting 2 weeks or more; or the
manifestations do not last for 2 weeks but occur substantially more frequently than three times a
year or once every 4 months; or they occur less frequently than an average of three times a year

testified that his conditions cause him pain every day – pain that is so bad it wakes him up at night (Tr. 54-55).  The medical records show Thornton made similar complaints to his doctors, and that he was receiving medication to treat those symptoms.  *E.g., supra* at 10-11.  The Commissioner does not argue to the contrary and, as a result, it is certainly possible that the ALJ could have concluded that Thornton satisfied this particular criterion of Listing 14.09D.

With respect to the remaining criteria, however, the Commissioner does argue that the ALJ's failure to consider Listing 14.09D is harmless because Thornton:

> . . . points to nothing in the medical record supporting his claim[ed] constitutional symptoms or signs, and the record does not support the presence of severe fatigue, fever, malaise or involuntary weight loss.  Nor does the record document the presence of marked limitations in at least two[11] areas of functioning.

(Doc. #9 at 18).  A review of the record, however, demonstrates that the Commissioner's argument lacks merit.

First, in order to satisfy Listing 14.09D, Thornton would need to establish the presence of "at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss)."  There is no evidence in the record that Thornton suffers from fever.  Thornton testified that he recently lost a substantial amount of weight (51 pounds), but says that he did so through a diet (Tr. 41).  While such testimony suggests to this court that Thornton's weight loss was not involuntary, such a conclusion is properly made by the ALJ.  *See Clifton*, 79 F.3d at 1009; *Bolla*, 2012 WL 884820, at *6.  More importantly, however, Thornton could meet the requirements of Listing 14.09D by demonstrating that he experiences severe fatigue and malaise.

---

or once every 4 months but last substantially longer than 2 weeks.  Listing 14.00I3.

[11] As set forth above, Listing 14.09D requires only a marked limitation in <u>one</u> area of functioning, not two, as the Commissioner asserts in his brief.

"Severe fatigue" is defined in the listings as "a frequent sense of exhaustion that results in significantly reduced physical activity or mental function."  Listing 14.00C2.  The ALJ did not explicitly evaluate whether Thornton experienced fatigue that would rise to this level.  Indeed, with respect to fatigue, the ALJ said only:  "There is no clear indication in the record that the claimant experiences such serious daytime fatigue that he must lie down and nap for 6 hours in a day, and he has not consistently reported experiencing significant fatigue or daytime sleepiness to treating sources (indeed, he reported having 'good sleeping habits' to his rheumatologist during every examination)."  (Tr. 19).

Again, while this court might be of the opinion that the evidence presented fails to establish the presence of "severe fatigue," it is up to the ALJ to make that determination, particularly where there is *some* evidence that Thornton suffers from what seems to be an abnormal degree of fatigue.  For example, Thornton testified that he nods off and gets woozy from his medications, in particular his narcotic Tylenol #4.  (Tr. 61).  He further testified that, because the pain he suffers is so severe, he has difficulty sleeping at night and, as a result, often stays in bed until 11:00 a.m.  (Tr. 54-55).  The court also notes that two of Thornton's treating physicians – Dr. Snyder and Dr. Robinson – completed medical source statements indicating that Thornton's pain, fatigue, or other symptoms would markedly interfere with his ability to complete a normal workday or workweek without interruption, or to perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. 372, 452).  The ALJ's conclusion that Thornton does not really need to "lie down and nap for 6 hours in a day" (Tr. 19) does not equate to a finding that Thornton does not suffer from "severe fatigue," as defined in the relevant Listing, because the Listing does not require a claimant to nap for any period of time each day.  Given the evidence contained in the record, it is *possible* that Thornton could establish

22

that he suffers from severe fatigue, which results in "significantly reduced physical activity or mental function," as required by Listing 14.09D.

Similarly, the ALJ does not reference "malaise," which is defined as "frequent feelings of illness, bodily discomfort, or lack of well-being that result in significantly reduced physical activity or mental function." 20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 14.00C2. This is true despite the fact that the record contains some evidence – albeit principally Thornton's own reports – of pain and discomfort. For example, Thornton indicated, in an undated disability report, that when he awakens in the morning, he is unable to stand up until his medication "kicks in." (Tr. 192). He described suffering from pain so severe that he cries "all through the night." (Tr. 204). He also consistently reported to his physicians difficulty with pain in the morning consistent with rheumatoid arthritis. (Tr. 203, 243). The court notes that Dr. Karrar frequently changed Thornton's medications and dosages in an apparently unsuccessful effort to relieve his pain. (Tr. 435-41). Had the ALJ evaluated Thornton's impairments in light of Listing 14.09D, it would have been *possible* – given the evidence in the record – for him to have concluded that Thornton suffered from malaise.

Lastly, in addition to repeated manifestations of inflammatory arthritis, severe fatigue, and malaise, in order to meet Listing 14.09D, Thornton also would need to show that he is markedly limited in his activities of daily living, maintaining social functioning, or maintaining concentration, persistence, or pace. Although the ALJ does not conduct a thorough analysis of this issue, he apparently concludes that Thornton is not markedly limited in maintaining concentration, persistence, or pace, because he rejects Dr. Robinson's and Dr. Snyder's opinions that Thornton *is* markedly limited in these areas as "unsupported by the evidence" and having "no basis in the evidence of record," respectively. (Tr. 20).

23

Even assuming that this is the case,[12] the fact remains that Thornton still could meet Listing 14.09D if he could establish that he is markedly limited in one of the other two areas identified – activities of daily living or maintaining social functioning.  The ALJ failed completely to consider whether Thornton is markedly limited in either of these areas.  And, although far from overwhelming, there is some evidence in the record suggesting that Thornton is limited in his activities of daily living.[13]  For example, Thornton indicated in a disability report that he has a hard time putting on shoes and socks, as well as stepping into the bathtub; and he testified at the hearing that he does not do laundry, is unable to wash dishes, and has not done yard work since 2008.  (Tr. 56-57, 204).  A claimant can be markedly limited in activities of daily living even if he is "able to perform some self-care activities."  20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 14.00I6.  Thus, there is some evidence in the record suggesting that Thornton is limited in activities of daily living, such that he could possibly have established the existence of such a limitation.[14]

While the ALJ may well reach the same ultimate conclusion on remand regarding Thornton's entitlement to benefits, the court cannot say that, if the ALJ had made the required findings at Step Three, he necessarily *would have* found that Thornton did not satisfy the relevant

---

[12] Since Thornton's treating physicians – Drs. Snyder and Robinson – completed medical source statements indicating that Thornton's pain, fatigue, or other symptoms would markedly interfere with his ability to complete a normal workday or workweek without interruption, or to perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 372, 452), on remand, the ALJ should reconsider all of the evidence presented on this issue, including the opinions of these treating physicians, in determining whether Thornton is markedly limited in maintaining concentration, persistence, or pace.

[13] With regard to "daily living," Listing 14.00I6 provides that relevant activities "include, but are not limited to, such activities as doing household chores, grooming and hygiene, using a post office, taking public transportation, or paying bills."  20 C.F.R. Pt. 404, Subpt. P., App. 1, Listing 14.00I6.

[14] On remand, the ALJ should also consider whether Thornton is markedly limited in maintaining social functioning.

24

Listing. Nor is it the court's role to make such factual determinations in the first instance. *See Clifton*, 79 F.3d at 1009; *Bolla*, 2012 WL 884820, at *6. In sum, the court cannot say that the ALJ's error was harmless, and remand is appropriate. *See Reynolds*, 424 F. App'x at 416.[15]

## III.   CONCLUSION

For foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [9] be DENIED, Thornton's Motion for Summary Judgment [8] be GRANTED IN PART to the extent it seeks remand, and that, pursuant to sentence four of 42 U.S.C. §405(g), this case be REMANDED back to the ALJ for further proceedings consistent with this Recommendation.

Dated: January 10, 2013                          s/David R. Grand
Ann Arbor, Michigan                              DAVID R. GRAND
                                                 United States Magistrate Judge

### NOTICE

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*,

---

[15] Thornton raises several other issues before this court, including that the ALJ erred in failing to: (1) give adequate weight to the opinions of his treating physicians, and (2) pose a proper hypothetical question to the VE. (Doc. #8 at 18-23). Because this court concludes that the ALJ erred in his Step Three analysis, however, and recommends that this matter be remanded to the ALJ for a determination as to whether Thornton meets the criteria of Listing 14.09D, the court need not consider these additional issues. Of course, the ALJ must give good reasons for the weight given to the treating physicians' opinions, 20 C.F.R. §404.1527(c)(2), and he must develop an RFC that adequately takes into account all of Thornton's credible impairments. *Fisk v. Astrue*, 253 Fed. Appx. 580, 584 (6th Cir. 2007); 20 C.F.R. §416.945; Soc. Sec. Rul. 96-8p, 1996 WL 374184, at *5.

638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 10, 2013.

<u>s/William Barkholz for Felicia M. Moses</u>
FELICIA M. MOSES
Case Manager
